# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 7, 2014

## STATE OF TENNESSEE v. PATRICK STANTON

**Appeal from the Criminal Court for Shelby County**
**No. 10-07433       Chris Craft, Judge**

---

### No. W2013-01133-CCA-R3-CD  - Filed February 5, 2014

---

Appellant, Patrick Stanton, was convicted of one count of aggravated burglary, a Class C felony, and one count of theft of property valued at $500 or less, a Class A misdemeanor. The trial court sentenced appellant as a Range III, persistent offender to fifteen years for his felony conviction and eleven months and twenty-nine days for his misdemeanor conviction. On appeal, appellant argues that the evidence at trial was insufficient to prove that he had the requisite intent to commit a theft prior to entering a habitation or that he actually committed a theft.  Following our review of the parties' briefs, the record, and the applicable law, we affirm appellant's convictions.

### Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal) and Jim Hale (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Patrick Stanton.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case concerns the aggravated burglary of a home and the theft of a laptop computer and stereo system on July 26, 2010. A Shelby County grand jury indicted appellant for aggravated burglary and theft of property valued at more than $500 but less than $1,000.

## I. Facts from Trial

At appellant's trial, the State presented Nikkia Smith, the victim, as its first witness. Ms. Smith testified that she was married to Patrick Smith and that she had three children: T.S., K.S., and Q.S.[1] Ms. Smith stated that at the time of this incident, only she and her children were living at her home because she was separated from her husband. On July 26, 2010, Ms. Smith left home at 6:15 a.m., took her son, Q.S., to morning football practice, and arrived at work by 7:00 a.m. Her two teenage daughters, T.S. and K.S., were still asleep when she left home. Ms. Smith testified that after she arrived at work, her younger daughter, K.S., called her cellular telephone and told her that there was "banging coming from [Ms. Smith's] bedroom" and that she heard glass breaking. Ms. Smith told her daughters to hide and then called 9-1-1 and her husband. Ms. Smith testified that she then called T.S.'s cellular telephone, and after answering, T.S. said, "[O]h, my God, mom. I can hear him. He's coming." T.S. then disconnected the telephone call.

Ms. Smith explained that after speaking with T.S. on the telephone, she left work and drove home, a drive which under normal circumstances took about 30 minutes. During the drive, Ms. Smith's husband called her and informed her that he was at the house. He explained that he had been "beating on the door" and calling their daughters' cellular telephones but that there was no response. Ms. Smith indicated that the noise her daughters had heard had come from her bedroom in the back of the house. When Mr. Smith arrived at the back of the house, Ms. Smith heard him shout at the intruder to stop. Ms. Smith then heard a gunshot, and Mr. Smith said, "I'm legal. These are my kids. My kids live here. They're in the house. Dude broke in my house." Mr. Smith then told Ms. Smith that their daughters were unharmed.

When Ms. Smith arrived home, law enforcement officers asked Ms. Smith to identify several items. She identified a gold pillowcase from her son's bed, which her mother had made for her son because he was a Pittsburgh Steelers fan. The pillow case had blood spatter on it. She identified the items inside the pillow case as her children's laptop computer and her son's stereo system. She testified that the laptop computer was purchased for over $500 and that the stereo system was purchased for under $100. Ms. Smith asserted that she did not give appellant permission to enter her home.

The State called Patrick Smith, Ms. Smith's estranged husband, as its next witness. Mr. Smith testified that on July 26, 2010, Ms. Smith called him at approximately 7:07 or 7:08 a.m. and told him that someone was attempting to gain entry into her home. She also told

---

[1] It is the policy of this court to protect the identity of juveniles. Therefore, we will use their initials throughout this opinion.

him that their daughters were inside the house. Mr. Smith stated that he immediately left work and proceeded to the house. Mr. Smith explained that this drive ordinarily took ten minutes but that he arrived at Ms. Smith's home in five minutes. Mr. Smith also explained that he had a valid handgun carry permit and that he owned a Smith and Wesson .40 caliber handgun.

When Mr. Smith arrived at the home, he noticed an unfamiliar white car with the trunk and the driver's side door open sitting in the parking lot next door. He "beat" on the front door for approximately five to ten minutes and attempted to call his daughters' cellular telephones. After he was unable to contact his daughters, Mr. Smith called Ms. Smith's cellular telephone. Ms. Smith directed Mr. Smith to go to the back of her house. After arriving in the backyard, Mr. Smith noticed that Ms. Smith's bathroom window was broken, and he heard noise coming from the side of the house. Mr. Smith testified that he looked around the corner of the house and that he saw appellant running toward him. After telling appellant to stop, Mr. Smith fired one shot into the ground. Appellant jumped over a six-foot-tall, chain-link fence and fell to the ground on the opposite side of the fence. He stood up and attempted to retrieve a pillowcase lying on the ground beside him, but he stumbled and fell. Appellant left the pillowcase lying on the ground and ran away. Mr. Smith testified that police officers arrived immediately after this encounter and that they apprehended appellant forthwith.

During cross-examination, Mr. Smith conceded that when appellant was running toward him, he did not have the yellow pillowcase in his hand and that he did not see appellant exit the house. Mr. Smith testified that when he fired his weapon, the shot did not hit appellant. In addition, Mr. Smith acknowledged that he never saw appellant actually touch the pillowcase. He merely reached for it.

K.S. testified next that on the morning of July 26, 2010, she awoke when her sister, T.S., told her that someone was breaking into their home. She stated that she heard glass breaking in the back of their home and that she called her mother. Her mother told them to hide while she called the police. K.S. stated that she and her sister went into the bathroom and hid in the bathtub, partially closing the shower curtain. She heard appellant open the door to her mother's bedroom, and she heard footsteps. K.S.'s and T.S.'s cellular telephones were on vibrate during this time. K.S. testified that both she and her sister were receiving telephone calls and that T.S. spoke with their mother briefly. However, T.S. disconnected the telephone call when they heard appellant in the hallway outside the bathroom. K.S. explained that she heard appellant "[check] the rest of the rooms," including the computer room, before he opened the bathroom door. Appellant turned the bathroom light on so that K.S. was able to see his face from his reflection in the mirror. Appellant left the bathroom after "a couple of seconds" and went into two other rooms, including Q.S.'s bedroom. K.S.

stated she could see appellant while he was in the hallway from his reflection in the bathroom mirror. A "few minutes later" K.S. heard her father knocking on their front door. K.S. testified that appellant began "pacing up and down the hallway" and that he then went toward the back of the house. K.S. stated that shortly thereafter, she heard a gunshot and her father yelling. K.S. and T.S. went out the front door.

Marvin Pender, a supervisor with the 9-1-1 Communications Department testified next. He stated that he was responsible for preserving the audio tapes and related documents from 9-1-1 calls. Mr. Pender testified that on July 26, 2010, Ms. Smith called 9-1-1 at 7:15 a.m. to report that someone was attempting to break into her home and that her daughters were inside the home. Law enforcement officers were dispatched to Ms. Smith's home, and the dispatcher attempted to contact the children but was unsuccessful. However, K.S. called 9-1-1 at 7:27 a.m. "crying and screaming," but the dispatcher was unable to determine what she was saying.

Tim Helldorfer, the Assistant Chief Investigator for the Shelby County District Attorney's Office, testified that he collected two saliva DNA samples from appellant on October 11, 2010, and that appellant signed a DNA sample release form. Mr. Helldorfer stated that appellant gave the samples voluntarily. Mr. Helldorfer packaged the samples and took them to the Tennessee Bureau of Investigation's ("TBI") crime laboratory.

Eric Carlisle, a crime scene investigator for the Memphis Police Department, testified next that he is responsible for processing crime scenes. He stated that on July 26, 2010, he was called to a crime scene on West Shelby Drive. Officer Carlisle explained that when he arrived, he took photographs inside and outside the house. He stated that the bathroom window in the rear of the house was broken and that outside in the adjoining property, there was an "off orange color[ed]" pillowcase with "some items in it and a stereo speaker on the ground." Officer Carlisle stated that after he finished photographing the scene, he retrieved the pillowcase, took it to a squad car, and laid the items inside the pillowcase on the car to photograph them. He testified that the pillowcase contained a CD player, a stereo speaker, and a laptop computer. He also noticed that the pillowcase had a blood stain or "red spot" on it and stated that the victim identified the items. Officer Carlisle also photographed a white vehicle in the church parking lot near Ms. Smith's home. The vehicle had a screwdriver and hammer in the driver's side floorboard. Finally, Officer Carlisle photographed appellant because appellant had blood on his clothing and a cut on his leg.

On cross-examination, Officer Carlisle conceded that he did not fingerprint the house, the stereo, the computer, or the speakers. He stated that he did not find any blood inside the house and that the items inside the pillowcase did not appear to be damaged.

Kcbena Cash, a patrol officer with the Memphis Police Department, testified that on July 26, 2010, he responded to a call regarding a burglary in progress. After he arrived at the scene, Officer Cash encountered Mr. Smith running toward him holding a gun and indicating that the burglar was running away. Officer Cash told Mr. Smith drop his weapon, which he did. Officer Cash then pursued and apprehended appellant as he was running down the street away from Ms. Smith's home. Officer Cash also ensured that K.S. and T.S. were unharmed. He secured the crime scene and observed the broken window and pillowcase. Officer Cash testified that Ms. Smith identified the items from the pillowcase.

The State's last witness was Lawrence James, a special agent forensic scientist with the TBI. He testified that he had a Bachelor of Science degree in biology and had completed the TBI Forensic DNA Training Program and the TBI Forensic Scientist School. His primary responsibilities with the TBI were examining evidence for the presence of body fluids and conducting DNA analysis. Agent James stated that he performed two tests on the pillowcase, which revealed that the substance on the pillowcase was human blood. He also compared the partial DNA profile found in the blood on the pillowcase with appellant's DNA and determined that the two samples matched. In other words, the DNA found on the pillowcase was the same as appellant's DNA. Agent James stated:

> [I]f I randomly went out into the population and pulled someone out of the Caucasian population, I would expect to find this profile that matched [appellant] in approximately one in one quintillion, 753 quadrillion individuals. Quintillion has 18 zeros behind it, just for reference. Quadrillion has 15 zeros behind it.
>
> If I were to randomly select out of the African[-]American population, I would expect to find that profile on approximately one in 20 quadrillion, 270 trillion individuals.
>
> If I selected from the Southeastern Hispanic population, I would expect to find approximately [one in] two quintillion, 403 quadrillion individuals.
>
> And out of the Southwestern population I would expect to find, an approximately one in 16 quintillion, 112 quadrillion individuals.

Agent James acknowledged that the probability of this DNA profile belonging to someone else exceeded the world population.

At the conclusion of the trial, the jury found appellant guilty of aggravated burglary and theft of property valued at $500 or less. The trial court sentenced appellant as a Range

III, persistent offender to fifteen years for his felony conviction and eleven months and twenty-nine days for his misdemeanor conviction.

## II. Analysis

Appellant argues that the evidence at trial was insufficient to support his convictions for aggravated burglary and theft. Specifically, he contends that the evidence failed to show that he had the requisite intent to commit a theft prior to entering the habitation or that he actually removed items from the home. The State responds that the evidence at trial was sufficient to sustain appellant's convictions. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for aggravated burglary, the State must prove beyond a reasonable doubt that appellant committed the burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault." *Id.* § 39-14-402(a)(1). Burglary can be proven through direct or circumstantial evidence. *See State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Aggravated burglary is a Class C felony. Tenn. Code Ann. § 39-14-403(b).

To support a conviction for theft of property, the State must prove that appellant, "with intent to deprive the owner of property, . . . knowingly obtain[ed] or exercise[ed] control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft of property valued at $500 or less is a Class A misdemeanor. Tenn. Code Ann. § 39-14-105(a)(1).

A jury convicted appellant of one count of aggravated burglary and one count of theft of property valued at $500 or less. Viewed in the light most favorable to the State, the evidence supports these convictions.

The evidence at trial showed that on July 26, 2010, appellant broke the window in Ms. Smith's bathroom and entered her home. K.S. testified that appellant then began entering each room within the house, including Q.S.'s bedroom, Ms. Smith's bedroom, and their computer room. K.S. also saw appellant's face when he opened the bathroom door and when he was in the hallway outside the bathroom. Mr. Smith then saw appellant outside Ms. Smith's home and saw appellant reach for a pillowcase that was lying on the ground. Ms. Smith later identified the pillowcase as belonging to her son. She also identified the laptop computer, which was purchased for over $500, and the stereo system, which was purchased for under $100, that were found inside or near the pillowcase. Appellant was also apprehended fleeing the scene of the burglary. Finally, appellant's DNA matched the DNA found on the pillowcase. This evidence supports appellant's convictions. From this proof, any rational jury could have found appellant guilty of aggravated burglary and theft beyond a reasonable doubt.

Appellant argues that the evidence failed to show that he had the requisite intent to commit a theft when he entered the habitation, which is required for an aggravated burglary conviction, or that he actually removed items from the home. However, a conviction for aggravated burglary can be established through either direct or circumstantial evidence; therefore, an eyewitness who saw appellant remove the items from the home or direct evidence that appellant planned the aggravated burglary is not required under the law. *See*

*Holland*, 860 S.W.2d at 59. The evidence here was sufficient to support appellant's convictions, and appellant is without relief as to this issue.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE